UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NEIGHBORS OF CASINO SAN PABLO, an unincorporated association, ) ) ) ) | |
| ANDRES SOTO, ) ) | |
| ANNE RUFFINO, ) ) | |
| ADRIENNE HARRIS, ) ) | |
| TANIA PULIDO, and ) ) | |
| JULIA AREAS, ) ) | |
| Plaintiffs, ) ) | |
| v. ) | Civil Case No. 09-2384 (RJL) |
| ) | |
| KEN SALAZAR, in his official capacity as Secretary of the Interior, ) ) ) | |
| LARRY ECHO HAWK, in his official capacity as Assistant Secretary of the Interior for Indian Affairs, ) ) ) ) | |
| TRACIE STEVENS, in her official capacity as Chairperson of the National Indian Gaming Commission, and ) ) ) ) | |
| NATIONAL INDIAN GAMING COMMISSION, ) ) ) | |
| Defendants. ) ) | |

1

# MEMORANDUM OPINION
(March 30, 2011) [#13]

Plaintiff, Neighbors of Casino San Pablo ("neighbors"), are an "unincorporated association comprised of residents, property owners and others who live, work, and/or own businesses . . . or who frequent the area around" property on which the Lytton Band of Pomo Indians (the "Lyttons" or "the tribe") operates a casino on land which the United States government holds in trust for the tribe's benefit. Pls.' First Amended Complaint ("Am. Compl."), Mar. 15, 2010, ¶ 9 [Dkt. #10]. Neighbors, along with Andres Soto, Adrienne Harris, Tania Pulido, and Julia Areas (collectively, "plaintiffs"), bring this action against various officials in the United States Department of the Interior, as well as the National Indian Gaming Commission ("NIGC") and its chairperson (collectively, "defendants"), alleging that the NIGC failed its statutory evaluation and enforcement duties with respect to the Lyttons, and that the NIGC acted arbitrarily and capriciously in the determinations it *did* make about the tribe's gaming, in violation of the Administrative Procedure Act, 5 U.S.C. § 701, *et seq.* Plaintiffs seek declaratory relief under 5 U.S.C. §§ 701-706 and 28 U.S.C. § 2201. Before this Court is defendants' Motion To Dismiss. Upon consideration of the parties' pleadings, relevant law, and the entire record herein, defendants' motion is GRANTED.

## BACKGROUND

In 1988, Congress enacted the Indian Gaming Regulatory Act ("IGRA") "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments."

25 U.S.C. § 2702(1). Under IGRA, a tribe may conduct gaming only on "Indian lands," *id.* §§ 2710(b)(1), (d)(3), which include "all lands within the limits of any Indian reservation" and "any lands title to which is either held in trust by the United States for the benefit of any Indian tribe." *Id.* § 2703(4). In 1988, Congress also established the National Indian Gaming Commission ("NIGC") to regulate Indian gaming under the IGRA, *see id.* §§ 2702(3), 2706(b), and to authorize enforcement actions for violations of the statute. *Id.* § 2713.[1]

In 1991, the federal government ("the Government") reinstated the Lyttons' recognition as an Indian tribe in California.[2] *See Artichoke Joe's v. Norton*, 216 F. Supp. 2d 1084, 1097 (E.D. Cal. 2002) (*Artichoke Joe's I*); *see also* Am. Compl. ¶ 55. As part of the reinstatement, the United States Secretary of the Interior ("the Secretary") took land into trust for the tribe. *Artichoke Joe's I*, 216 F. Supp. 2d at 1096-97. That land,

---

[1] The IGRA divides tribal gaming into three "classes." Class I games consist mostly of "social games with small prizes" and are regulated exclusively by Indian tribes. *Artichoke Joe's Cal. Grand Casino v. Norton*, 278 F. Supp. 2d 1174, 1178 n.5 (E.D. Cal. 2003) (*Artichoke Joe's II*). Class II games, which include certain types of bingo and card games "that are explicitly authorized by the laws of the State, or . . . are not explicitly prohibited by the laws of the State and are played at any location in the State," are regulated by both tribal government and the federal government. *Id.* (citing 25 U.S.C. § 2703(7)(A) and § 2710(d)). Class III games, defined as "all forms of gaming that are not class I gaming or class II gaming," § 2703(8), permits games such as electric "game[s] of chance or slot machines of any kind." *Artichoke Joe's II*, 278 F. Supp. 2d at 1178, n.5. To conduct class III gaming, a tribe must first enter a compact with the state, and the Secretary of the Interior must approve that compact. 25 U.S.C. §§ 2710(d)(3), (8).

[2] The reinstatement was effectuated through a stipulation between the Lyttons, the United States, and the County of Sonoma, California – the county where the tribe's lands were historically located. *See Scotts Valley Band of Pomo Indians of the Sugar Bowl Rancheria v. United States*, No. 86-3660 (N.D. Cal. Mar. 22, 1991) (stipulating entry of judgment).

located in Sonoma County, California, was not eligible for gaming. *Artichoke Joe's Cal. Grand Casino v. Norton*, 278 F. Supp. 2d 1174, 1177 (E.D. Cal. 2003) (*Artichoke Joe's II*). The Lyttons, however, sought to conduct gaming on their land and identified nine and one-half acres on a different site in San Pablo, California (the "San Pablo property"), which was eligible for tribal gaming. *Id.; see also* Am. Compl. ¶ 2.

In 2000, Congress enacted the Omnibus Indian Advancement Act ("Omnibus Act"), Pub. L. 106-568, 114 Stat. 2868, and through it directed the Secretary to take the San Pablo property into trust for the Lyttons in a manner which made it eligible for gaming under the IGRA.[3] Specifically, Section 819 instructed that:

> Notwithstanding any other provision of law, the Secretary of the Interior **shall accept for the benefit of the Lytton Rancheria of California** the land described in that certain grant deed dated and recorded on October 16, 2000, in the official records of the County of Contra Costa, California . . . . The Secretary shall declare that such land is **held in trust by the United States for the benefit of the Rancheria and that such land is part of the reservation of such Rancheria** under sections 5 and 7 of the Act of June 18, 1934 (48 Stat. 985; 25 U.S.C. 467). Such land shall be deemed to have been held in trust and part of the reservation of the Rancheria prior to October 17, 1988. *Id.* (emphasis added).

Importantly, Section 819 deemed the San Pablo property "to have been held in trust and part of the reservation . . . prior to October 17, 1988" – the date after which the IGRA prohibited[4] gaming on newly acquired lands. Thus, by treating the acquisition as

---

[3] The Secretary took the San Pablo property into trust in 2003 and declared the property part of the Lytton reservation in 2004 (the "2004 proclamation"). Am. Compl. ¶ 65; Defs.' Mot. to Dismiss at 6 [Dkt. # 13].

[4] The few exceptions to this prohibition are found in 25 U.S.C. § 2719.

one occurring before October 17, 1988, Congress – through the language of the Omnibus Act – exempted the Lyttons' San Pablo property from the IGRA prohibition and rendered the San Pablo property eligible for gaming.

Even if a tribe is eligible to conduct gaming on Indian lands, however, it must adopt a tribal gaming ordinance and gain approval from the NIGC for such gaming to be legal. 25 U.S.C. §§ 2710(b)(2), (d)(1)(A). Years before the Government took into trust the San Pablo property eligible for gaming, the Lyttons prospectively sought eligibility for gaming on their lands.[5] To that end, the Lyttons adopted, and the NIGC approved, a tribal gaming ordinance in July 1999. Am. Compl. ¶ 56; Defs.' Mot. to Dismiss at 9. The 1999 ordinance permitted gaming on reservation lands, including land held in trust by the United States for the benefit of the Lyttons, and thus was not "site-specific." Defs.' Mot. to Dismiss at 9; *see also* Am. Compl. ¶ 56.

In 2003, after the San Pablo property was taken into trust, the Lyttons began conducting "class II" gaming under the ordinance approved by the NIGC in 1999.[6] Am.

---

[5] At that time, property in Sonoma County had been taken into trust for the Lyttons, but was not eligible for gaming.

[6] Because the Lyttons were not prepared to manage the gaming facility on the San Pablo property, they opted to allow a non-tribal entity, SF Casino Management, to continue operations until the tribe was prepared to manage the facility alone. *See* 25 U.S.C. § 2710(b)(4) (allowing tribes to license a non-tribal entity to conduct gaming in accordance with state law); *see also id. at* § 2711 (requiring NIGC approval for a tribe that contracts with a non-tribal entity for management of a gaming facility). That temporary license lasted from October 9, 2003 (when the San Pablo land was taken into trust) until November 24, 2003, when the tribe took full ownership and control over the casino. Defs.' Mot. to Dismiss at 10. It was revoked on December 13, 2003. *Id.* Notwithstanding revocation of SF Casino Management's temporary gaming license, the

Compl. ¶ 66; Defs.' Mot. to Dismiss at 10. In January 2008, the Lyttons enacted an amended gaming ordinance which repealed and replaced the 1999 ordinance and provided for "class II" and "class III" gaming on the tribe's land. Am. Compl. ¶ 75; Pls.' Ex. B at 3; Defs.' Mot. to Dismiss at 11. In May 2008, the NIGC approved the ordinance, which permitted "[a]ll forms of Class II gaming as defined in the IGRA" and "[a]ll forms of Class III gaming as defined in the [IGRA] . . . *and* authorized by a Compact between the Tribe and the State of California." Pls.' Ex. B at 4 (emphasis added). Further, the NIGC approved class II and III gaming on "Indian lands," but did not render site-specific approval and did not identify specific games which could be conducted on the San Pablo property. *See* Am. Compl. ¶ 76; Pls.' Ex. B at 2; Defs.' Mot. to Dismiss at 11.

Plaintiffs filed suit in March 2010, claiming that they had suffered injuries – such as increased traffic, interstate congestion, property crimes, prostitution, pollution, and diminution in property value, among other things – as a result of the Lyttons' operation of a casino on the San Pablo property. Plaintiffs allege eight violations of the Administrative Procedure Act, most of which boil down to two claims: First, that the Lyttons do not have proper jurisdiction or sovereignty over the San Pablo property.[7]

---

tribe's 1999 gaming ordinance remained in effect on the San Pablo property. *Id.* at 10-11.

[7] Plaintiffs' insistence that "the federal government could not, solely by acquiring title to the land, authorize the Lyttons to exercise sovereignty over it" is a red herring. Pls.' Opp'n to Defs.' Mot. to Dismiss, July 7, 2010, at 21-23 ("Pls.' Opp'n") at 1 [Dkt. #27]. The threshold issue is not whether the San Pablo property is sovereign, but rather

Second, that before approving a gaming ordinance, the NIGC was required to – but did not – make specific gaming determinations or an "Indian lands determination" about the San Pablo property.

## ANALYSIS

### I. Standard of Review

Defendants move to dismiss this action for failure to state a claim upon which relief may be granted under Fed. Rule Civ. P. 12(b)(6). Under Rule 12(b)(6), the Court accepts the allegations in the complaint as true and resolves ambiguities in favor of the pleader. *Harbury v. Deutch*, 244 F.3d 956, 958 (D.C. Cir. 2001) (internal citation omitted). Importantly, however, the Court "need not accept as true inferences unsupported by facts set out in the complaint or legal conclusions cast as factual allegations." *Guam Indus. Servs., Inc. v. Rumsfeld*, 405 F. Supp. 2d 16, 19 (D.D.C. 2005) (citing *Warren v. District of Columbia*, 353 F.3d 36, 39 (D.C. Cir. 2004)).

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (internal citations and quotations omitted). But "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (internal citations and quotations omitted).

---

whether it is Indian lands on which gaming is authorized under the IGRA. Unfortunately for plaintiffs: it is!

Defendants also move to dismiss for lack of subject-matter jurisdiction under Fed. R. Civ. P. 12(b)(1). A plaintiff has the burden of establishing jurisdiction under Rule 12(b)(1). *Theodore ex rel. A.G. v. Gov't of D.C.*, 655 F. Supp. 2d 136, 141 (D.D.C. 2009) (internal citations omitted). In addition, for purposes of a Rule 12(b)(1) motion, a plaintiff's lack of standing to bring a claim is considered a defect in the court's subject-matter jurisdiction and is thus fatal to the claim. *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987) (citing *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986)). Unfortunately for plaintiffs, even taking as true all of the allegations in the complaint, each of the eight counts must be dismissed. How so?

## II. Plaintiffs Fail To State A Claim On Which Relief May Be Granted.

### A. The NIGC Was Not Required to Issue an Indian Lands Determination Before Approving the Lytton Gaming Ordinance.

The majority of plaintiffs' claims hinge on their assertion that the "NIGC had a mandatory duty under IGRA to conduct an analysis and make a determination as to whether [proposed gaming lands] w[ere] Indian land under the jurisdiction of the Lyttons."[8] Am Compl. ¶¶ 83, 91. *But see* 25 U.S.C. § 2710(b). Specifically, plaintiffs allege in Counts I and II that the NIGC was required, but failed, to make such "Indian lands determinations" before approving the Lyttons' 2003 and 2008 gaming ordinances.

---

[8] Plaintiffs seek declarations that the NIGC was required to make "Indian lands determinations" with respect to the 2003 and 2008 ordinances and ask for the ordinances to be set aside and remanded to the NIGC for a proper determination. Am. Comp. ¶¶ 86, 92.

8

Am Compl. ¶¶ 83, 91. Yet plaintiffs cannot, and do not, point to statutory language or case law from our Circuit requiring such a determination.

Indeed, to the extent statutory language supports either party's position, it supports defendants'. The plain language of the IGRA requires Indian gaming to take place on "Indian lands," 25 U.S.C. § 2710(b), and defines "Indian lands" as "any lands title to which is . . . held in trust by the United States for the benefit of any India tribe." *Id.* § 2703(4). The action Congress directed in the 2000 Omnibus Act easily meets these requirements: Section 819 not only directed the Secretary to take land into trust for the Lyttons' benefit (thus immediately qualifying that property as "Indian lands"); it also *explicitly* exempted the Lyttons' property from a statutory prohibition on Indian gaming on lands acquired after October 17, 1988. The IGRA requires no further NIGC determination regarding the Lyttons' lands.[9] Specifically, the plain language of the IGRA did not require the NIGC to perform an independent "Indian lands" determination in conjunction with the Lyttons' submission of non-site-specific[10] gaming ordinances. *See N. Cty. Cmty. Alliance, Inc. v. Salazar*, 573 F.3d 738, 747 (9th Cir. 2009) (persuasive authority holding that the "NIGC was under no judicially enforceable obligation to make an Indian lands determination" because "nothing in the text of the IGRA, or in any

---

[9] Under the APA, only discrete agency action that is legally required can be compelled. *See Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004). Because the NIGC has no statutory duty to make an Indian lands determination prior to approving a gaming ordinance, plaintiffs' "failure to act" argument fails to state a claim.

[10] Defendants acknowledge that the NIGC should make an Indian lands determination "if a tribe submits a site-specific gaming ordinance or management contract that indicates the proposed location of the gaming." Mot. to Dismiss at 16.

9

implementing regulation . . . required the NIGC to make an Indian lands determination when a tribe licensed or began construction of a class II gaming facility already authorized by a non-site-specific ordinance").

Plaintiffs concede this point and acknowledge that the Lyttons' 1999 gaming ordinance was not site-specific. Am. Compl. ¶ 56; Pls.' Opp'n to Defs.' Mot. to Dismiss ("Pls.' Opp'n"), July 7, 2010, at 12 [Dkt. #27]. They contend, however, that the temporary gaming license granted in 2003 *was* site-specific, and that the NIGC was thus required to make a specific Indian lands determination with respect to that proposed ordinance. Am. Compl. ¶¶ 66-69. Contrary to plaintiffs' characterizations,[11] the 2003 "ordinance" was actually a resolution by the Lytton tribe to revoke SF Casino Management's temporary, class II gaming and management license, which had been granted pursuant to 25 U.S.C. § 2710(b)(4)(A). See Am. Compl., Ex. A, at 2. And although the tribal resolution referred to the San Pablo property on which SF Casino

---

[11] Although this Court must accept as true all factual allegations plaintiffs plead in the complaint, the Court is not bound by legal conclusions masquerading as factual narratives. Here, plaintiffs assert as fact what is actually a legal conclusion: that is, the legal effect of the 2003 "ordinance." To properly discern the legal effect of the tribe's 2003 gaming resolution and the NIGC's approval of it, the Court turns to plaintiffs' Exhibits A and B [Dkt. ##10-1 & 10-2], which contain copies of the 2003 and 2008 ordinances. Because these exhibits are public records *and* attached to, and incorporated by reference in, the complaint, Am. Compl. ¶¶ 57, 67, reviewing them does not convert this motion to dismiss into a motion for summary judgment. *See Randolph v. ING Life Ins. & Annuity Co.*, 486 F. Supp. 2d 1, 5 (D.D.C. 2007) ("The court is limited to considering facts alleged in the complaint, any documents attached to or incorporated in the complaint, matters of which the court may take judicial notice, and matters of public record.") (internal citation omitted). Upon review, it is clear that because the NIGC is not required, as a matter of law, to make an Indian lands determination before approving a non-site-specific gaming ordinance, and because the tribe submitted only non-site specific ordinances for approval, plaintiffs' Counts I and II fail to state a claim.

Management operated its temporary license, the resolution did not seek or approve new gaming authority for the San Pablo property.[12] *See id.* at 2-3. Nor did the NIGC approve a site-specific ordinance by approving the Lyttons' 2003 resolution. *Id.* at 4 ("This letter constitutes approval under the [IGRA] . . . . the ordinance is approved for gaming only on Indian lands, as defined in the IGRA."). Accordingly, the NIGC had no obligation to make additional determinations about the Lyttons' Indian land.

In the same vein, plaintiffs allege that the Lyttons' 2008 ordinance was site-specific because the NIGC "knew" that the tribe was operating a casino on the San Pablo property.[13] Am. Compl. ¶¶ 87-92. Even assuming the truth of plaintiffs' allegation, however, knowledge of gaming activities and the Indian lands on which they occur does not create an additional legal duty (such as an Indian lands determination) not imposed by statute. Because plaintiffs seek relief for alleged failures of statutory duties that do not exist, plaintiffs fail to state a claim as to Counts I and II. For the same reason, Count III – which is premised on plaintiffs' incorrect belief that the NIGC "made or is deemed to have made a determination that the [San Pablo] [p]roperty is Indian land," Am. Compl. ¶ 94, must also be dismissed under Rule 12(b)(6) for failure to state a claim.[14]

---

[12] This is precisely because the 1999 non-site-specific gaming ordinance was still in effect for the Lyttons' "Indian lands," which included the San Pablo property.

[13] Inexplicably, plaintiffs simultaneously admit that "the 2008 Ordinance may not have specifically identified the Casino site." Pls.' Opp'n at 13.

[14] Because Count III may be dismissed for failure to state a claim (and for lack of standing, *see infra* III.B), this Court need not, and will not, address defendants' Quiet Title Act arguments. *See* Mot. to Dismiss at 17-19.

## B. The NIGC Was Not Required To Rule On The Classification of Specific Games Before Approving the Lytton Gaming Ordinance; And Because NIGC's Enforcement Decisions Are Discretionary, They Are Not Subject To Judicial Review.

Moreover, Counts VI, VII, and VIII also fail to state a claim under Rule 12(b)(6) and must be dismissed. All three Counts relate to the 2008 Lytton gaming ordinance through which the NIGC broadly approved "all forms of [c]lass II gaming as defined in the [IGRA]," Am. Compl., Ex. B, at 4, and all three suffer fatal defects. In Count VI, plaintiffs allege that the NIGC's 2008 approval was unlawful because it authorized certain electronic games which are permissible under IGRA class II but illegal under California law. Am. Compl. ¶ 113. In Count VII,[15] plaintiffs allege that the 2008 ordinance was unlawful because the NIGC "knew or should have known that the Lyttons were operating . . . slot machines," which are class III games requiring a tribal compact. Am. Compl. ¶¶ 116-18. In Count VIII, plaintiffs assert that the Lyttons operate unauthorized class III slot machines – and seek a declaration stating as much. Am. Compl. ¶¶ 121-23.

Counts VI and VII fail to state a claim because plaintiffs erroneously assert that the NIGC had a duty to announce decisions about specific types of games when it approved the 2008 ordinance. To the contrary, the IGRA states that the NIGC Chairman "shall approve any tribal ordinance or resolution concerning the conduct [] or regulation of [c]lass II gaming." 25 U.S.C. § 2710(b)(2). Neither the IGRA nor applicable

---

[15] Through Counts VI and VII, plaintiffs seek a declaration that the NIGC's approval was arbitrary, capricious, and an abuse of discretion, and ask this Court to set aside the 2008 ordinance. Am. Compl. ¶¶ 114, 119.

regulations require the tribal ordinance to describe specific games, or require the NIGC to delineate approval for anything other than a broad class of games (such as class II). *See* 25 U.S.C. § 2710; *see also* 25 C.F.R. § 522. As a result, the NIGC has no duty to make specific game determinations and Counts VI and VII fail to state a claim.

Counts VI, VII, and VIII suffer an additional defect: each Count asserts the legal conclusion that the Lyttons operate class III games on the San Pablo property, *see* Am. Compl. ¶¶ 71, 73, and that the NIGC's 2008 approval of gaming on the San Pablo property is improper since the Lyttons did not enact a tribal compact for class III gaming. But even assuming that the Lyttons *were* improperly operating class III games, plaintiffs fail to state a claim because this Court cannot compel the NIGC to undertake an enforcement action. *See Heckler v. Chaney*, 470 U.S. 821, 831 (1985) ("[a]n agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion."). Moreover, persuasive authority suggests that "the IGRA provides no private right of action against [a] Tribe, [a] State, the federal government or any official or agency thereof" to enforce conduct that is allegedly unlawful under the IGRA. *Hartman v. Kickapoo Tribe Gaming Comm'n*, 176 F. Supp. 2d 1168, 1175 (D. Kan. 2001) (collecting cases). Because an agency's enforcement discretion is not subject to judicial review under *Heckler*, and because Congress has evinced no intent to "circumscribe agency enforcement discretion" here, 470 U.S. at 834-35, plaintiffs fail to state a claim for Counts VI, VII, and VIII.

## III. Plaintiffs' Remaining Claims Must Be Dismissed Because This Court Has No Subject-Matter Jurisdiction Over Them.

*A. This Court Has No Subject-Matter Jurisdiction Over Count IV.*

Plaintiffs' remaining claims must be dismissed because this Court has no subject-matter jurisdiction over them. To start, the Court has no subject-matter jurisdiction over Count IV,[16] which seeks relief based only on the Declaratory Judgment Act, 28 U.S.C. § 2201 ("DJA"). The DJA "creates a remedy in cases otherwise within the Court's jurisdiction," but "does not constitute an independent basis for jurisdiction." *Lac Vieux Desert Band of Lake Superior Chippewa Indians of Mich. v. Ashcroft*, 360 F. Supp. 2d 64, 66 n.3 (D.D.C. 2004); *see also Skelley Oil Co. v. Phillips Petrol. Co.*, 339 U.S. 667, 671-72 (1950). Because plaintiffs allege no independent cause of action for Count IV,[17] this Court does not have jurisdiction to hear it.

*B. Plaintiffs Lack Standing To Bring Their Constitutional Claims.*

In addition, the Court has no subject-matter jurisdiction over the constitutional claims in Counts III, IV, and V because plaintiffs lack standing to bring them. Counts

---

[16] Count IV seeks a declaration that the San Pablo property "remains subject to the plenary jurisdiction" of California, notwithstanding the Secretary taking the land into trust for the benefit of the Lyttons. Am. Comp. ¶¶ 101, 103.

[17] Although plaintiffs incorporate the first 98 paragraphs of their complaint into Count IV, *see* Pls.' Opp'n at 25-26, none of the causes of action cited in the first three counts provides a cause of action through which this Court could award the declaratory relief plaintiffs seek. Moreover, plaintiffs point to no statutory authority, in the IGRA or otherwise, under which plaintiffs would be entitled to a declaration that the San Pablo property is subject to the jurisdiction of California. Defs.' Reply Memo., Aug. 13, 2010, at 11-12 [Dkt. #31] ("Defs.' Reply").

III, IV, and V are largely based on the claim that California retains plenary jurisdiction[18] over the Lyttons' San Pablo property, notwithstanding the Secretary taking into trust that property pursuant to Section 819. *See* Am. Compl. ¶¶ 93-108. By bringing these claims, plaintiffs seek to invoke California's alleged jurisdiction over the San Pablo property – not plaintiffs' own rights. To the extent that these allegations are construed properly as constitutional violations of the Enclaves Clause[19] or the Tenth Amendment,[20] plaintiffs lack standing under this Court's case law and their claims must be dismissed.[21] *See City of Roseville v. Norton*, 219 F. Supp. 2d 130, 144 (D.D.C. 2002), *aff'd*, 348 F.3d 1020 (D.C. Cir. 2003) ("Plaintiffs' claims present a clear example of when third party prudential concerns weigh against permitting plaintiffs to argue claims on behalf of a third party."). *See also Artichoke Joe's II*, 278 F. Supp. 2d at 1181 ("Because the plaintiffs do not act with the authority of the State of California or its officers, they do not

---

[18] Plaintiffs allege that because the federal government did not retain jurisdiction over the San Pablo property upon California's admission to the Union, and because California failed to consent to jurisdiction over its lands, California retains plenary jurisdiction over the San Pablo property. Am Compl. ¶¶ 40-41, 65, 77.

[19] Plaintiffs do not invoke explicitly the Enclaves Clause, but they do imply it by contending that the state of California did not consent properly to ceding jurisdiction to the Lyttons; that the San Pablo property is under plenary jurisdiction of the state; and that Congress (by passing Section 819) "exceeded the [government's] statutory and Constitutional authority." *See* Am. Compl. ¶¶ 96, 102, 106.

[20] *See, e.g.*, Am. Compl. ¶ 96 (alleging that Congressional actions related to California's plenary powers were beyond Congress' authority).

[21] If plaintiffs' contention is true, *see* Pls.' Opp'n at 32, and they do not bring an Enclaves Clause claim, Counts III, IV, and V still fail because they allege no cause of action. *See Hartman v. Kickapoo Tribe Gaming Comm'n*, 176 F. Supp. 2d 1168, 1175 (D. Kan. 2001) ("[The] IGRA provides no private right of action against the . . . federal government or any official or agency thereof.").

15

have standing to assert a Tenth Amendment claim" or an Enclaves Clause claim). Because plaintiffs lack standing to bring the constitutional aspects of Counts III, IV, and V, this Court must dismiss them.

### C. Plaintiffs Lack Standing For Their Claim Against The Secretary Regarding Congressionally Mandated Acquisition Of Land Into Trust.

Plaintiffs also lack standing to bring Count V because they cannot show redressabilty.[22] *See, e.g., County of Delaware, Pa. v. Dep't of Transp.*, 554 F.3d 143, 149 (D.C. Cir. 2009) (a plaintiff lacks standing to bring a claim if the relief he seeks does not alleviate the alleged injury). Here, the relief plaintiffs seek – a declaration that California "has and retains its sovereignty over the [p]roperty and an order setting aside the [2004] Proclamation," Am. Compl. ¶ 108 – does not provide redress for the gaming-related injuries plaintiffs allege. The Secretary's 2004 proclamation of the San Pablo property as part of the Lytton reservation did not authorize gaming on, or render eligible for gaming, the San Pablo property; that occurred in 2003, when the Secretary took the San Pablo property into trust pursuant to Section 819. As a result, issuing a declaration that California still retains plenary jurisdiction over the San Pablo property would not nullify the Lyttons' gaming eligibility. Nor would such a declaration nullify the

---

[22] Even if plaintiffs did have standing, Count V fails to state a claim under Rule 12(b)(6) because Section 819 mandated that the Secretary take into trust the San Pablo property and required that the Secretary issue a reservation proclamation. Pub. L. 106-568 § 819, 114 Stat. 2868. *See also, e.g., Churchill Cnty. v. United States*, 199 F. Supp. 2d 1031, 1033-34 (D. Nev. 2001) ("Shall is a mandatory term, indicating the lack of discretion on the part of the Secretary.").

16

Secretary's duty to take lands into trust under Section 819. Plaintiffs therefore lack standing and this Court has no subject-matter jurisdiction to hear Count V.

### D. This Court Lacks Subject-Matter Jurisdiction Over Plaintiffs' Challenge To Non-Final Agency Actions.

Finally, plaintiffs lack standing to bring Counts VI, VII, and VIII because those counts do not challenge final agency action and are therefore unreviewable. Judicial review of the NIGC's decisions is restricted to final decisions under 25 U.S.C. §§ 2710-13. *See* 25 U.S.C. § 2714 ("Decisions by the Commission pursuant to sections 2710, 2711, 2712, and 2713 of this title shall be final agency decisions for the purpose of appeal to the appropriate Federal district court."); *see also Lac Vieux Desert Band of Lake Superior Chippewa Indians of Mich. v. Ashcroft*, 360 F. Supp. 2d 64, 67-68 (D.D.C. 2004). Although Counts VI and VII nominally challenge the NIGC's approval of the 2008 ordinance under Section 2710, Am. Compl. ¶¶ 110, 116, each of Counts VI, VII, and VIII[23] ultimately seeks relief in the form of compelled NIGC enforcement. But even if plaintiffs are correct that impermissible class III gaming is being conducted on the San Pablo property, the NIGC's decision *not* to initiate enforcement action is not final agency action reviewable under the APA.[24] Moreover, plaintiffs do not have standing to invoke

---

[23] In Count VI, Plaintiffs allege that defendants' class II games are illegal under California law and seek an order setting aside the 2008 ordinance. Pls.' Opp'n at 43. For Count VII, plaintiffs admit that "the issue to be determined is whether the machines are class III slot machines," *id.* at 39; and Count VIII seeks a declaration that defendants' gaming machines are illegal class III slot machines, not permissible class II machines. Am. Compl. ¶ 123.

[24] Moreover, the IGRA does not require the NIGC to make determinations about specific class II games, *see* 25 U.S.C. § 2710(b), and the 2008 ordinance restricts its

25 U.S.C. § 2714 judicial review to enforce a duty – the NIGC making specific gaming determinations – not contained within Section 2710. Plaintiffs do not have standing to challenge non-final agency actions and as a result, Counts VI, VII, and VIII must be dismissed.

## CONCLUSION

For all of the foregoing reasons, the Court GRANTS the United States' Motion to Dismiss [Dkt. #13], dismissing with prejudice all counts which fail to state a claim (Counts I, II, III; Counts VI and VII (to the extent they seek rulings on classifications of specific games before approving the Lytton gaming ordinance); and Counts VI, VII, and VIII (to the extent they seek enforcement of discretionary NIGC decisions which are not subject to judicial review)), and dismissing without prejudice all remaining counts over which this Court has no subject-matter jurisdiction (all or parts of Counts III, IV, V, VI, VII, and VIII).

An Order consistent with this decision accompanies this Memorandum Opinion.

_____
RICHARD J. LEON
United States District Judge

---

authorization of "[a]ll forms of Class II gaming" to those "defined in the [IGRA]." Pls.' Ex. B at 4. *See also* Pls.' Opp'n at 37; Defs.' Reply at 14.